### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

United States of America,

                Plaintiff,

v.

Randy Omero Valle,

                Defendant.

Case No. 23-cr-350 (MJD/TNL)

**REPORT &
RECOMMENDATION**

Thomas M. Hollenhorst, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Kenneth U. Udoibok, Kenneth Ubong Udoibok, P.A., The Flour Exchange, Suite 5010, 310 Fourth Avenue South, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Randy Omero Valle's Motion to Suppress Search and Seizure Evidence, ECF No. 35, and Motion to Suppress Statements, ECF No. 38. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Michael J. Davis, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on May 31, 2024. ECF No. 44. Assistant United States Attorney Thomas Hollenhorst appeared on behalf of the United States of America (the "Government"). Kenneth Udoibok appeared on behalf of Defendant Randy Omero Valle

("Defendant"). At the hearing, the Government offered, and the Court received Government Exhibits 1 through 3. *Id.* Government Exhibit 1 is the application in support of a search warrant for a UPS parcel and the search warrant dated September 19, 2023. *See* Gov't's Ex. 1. Government Exhibit 2 is the application in support of a search warrant to search the premises located at XXXX Glenwood Avenue, Unit 2, in Minneapolis, Minnesota and the search warrant dated September 20, 2023. *See* Gov't's Ex. 2. Government Exhibit 3 is the audio and video recording of the interview of Defendant that took place on September 20, 2023. *See* Gov't's Ex. 3. Also at the hearing, Court heard testimony from Special Agent Michael Cohen of the Drug Enforcement Administration. *See* ECF No. 44. These motions are ripe for determination by the Court. The Court will address the relevant facts and testimony as they pertain to each motion.

## II.  ANALYSIS

### A.  Motion to Suppress Search and Seizure Evidence

Defendant is challenging two search warrants. *See* ECF No. 35; Tr. 6:23-7:21, ECF No. 45. He seeks a "four corners" review of the first search warrant for the UPS parcel, Tr. 7:24-8:2; *see also* Gov't's Ex. 1, and argues that the issues with the second search warrant for the residence at Glenwood Avenue, *see also* Gov't's Ex. 2, rise and fall with the first search warrant. Tr. 8:3-23. Defendant also argues that the warrants are so lacking in probable cause that the *Leon* good faith exception does not apply. *See* ECF No. 35 at 2. The Government argues that a four corners review will show that both search warrants were properly issued and executed. *See* Gov't's Resp. at 2, ECF No. 39.

"The Fourth Amendment requires that search warrants be supported by probable

cause." *United States v. Tripp*, 370 Fed. App'x 753, 757 (8th Cir. 2010). "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) (quotation omitted); *accord Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."); *see also United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) ("[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue.").

"The court must make a 'common-sense decision' based on the totality of the circumstances set forth in the affidavit as to whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Skarda*, 845 F.3d 370, 376 (quoting *Gates*, 462 U.S. at 238); *see United States v. Davis*, 867 F.3d 1021, 1027 (8th Cir. 2017) ("The determination of whether or not probable cause exists to issue a search warrant is to be based upon a common-sense reading of the entire affidavit." (quotation omitted)). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . [the Eighth Circuit has] also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v.*

3

*Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). "Factors to consider in determining whether a warrant application sufficiently links the items to be seized with the place to be searched include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *United States v. Roberts*, 975 F.3d 709, 713 (8th Cir. 2020) (quoting *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017)).

"When an issuing court relies solely on an affidavit to determine whether probable cause exists, th[e reviewing] court only looks to the information found within the four corners of the affidavit." *United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021) (quotation omitted). "Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference." *United States v. Willis*, No. 11-cr-13 (DSD/JJK), 2011 WL 1100127, at *2 (D. Minn. Mar. 14, 2011), *report and recommendation adopted*, 2011 WL 1060981 (D. Minn. Mar. 23, 2011); *see also, e.g.*, *Evans*, 4 F.4th at 636.

## 1. Search Warrant for the Parcel

Airport Police Officer Irvin applied for and was the affiant for the September 19, 2023 search warrant for the UPS parcel. *See* Gov't's Ex. 1 at Application Page 1. Officer Irvin has been assigned to the Airport Police Narcotics Interdiction Unit in the State of Minnesota since 2017 but Officer Irvin has been an Airport Police Officer since 2013. *Id.* Officer Irvin has experience with narcotics interdiction both in employment and in educational settings. *Id.* at Application Page 1-2. Both Officer Irvin and his K9 partner are certified by the United States Police Canine Association and the Northern American Police

4

Work Dog Association to detect odors of various controlled substances including but not limited to methamphetamine, cocaine, and crack cocaine. *Id.* at Application Page at 2.

On the date the first warrant was issued, Officer Irvin located a suspicious looking parcel with the tracking number 1Z58FV760100110404 at the Minneapolis UPS sorting facility. *Id.* Officer Irvin found the parcel, and in particular its label, to be suspicious for five reasons. *Id.* First, the parcel was coming from California which is considered a source state for narcotics manufacturing. *Id.* Second, in the past, the Airport Police Narcotics Interdiction Unit has identified many packages coming from California and containing illicit narcotics. *Id.* Third, the parcel had next day delivery and was being sent person to person. *Id.* Fourth, law enforcement's databases showed that the receiver's name listed on the package did not exist at the receiver's address at Glenwood Avenue in Minneapolis, Minnesota. *Id.* And, fifth, law enforcement's databases also showed that the sender address was a postal connection shipping center which was not the address connected to the sender's name. *Id.* Officer Irvin stated that the above suspicious indicators were consistent with previous suspicious packages that did contain illicit narcotics. *Id.*

Officer Irvin further stated that after reviewing the suspicious information from the label, his K9 partner sniffed the suspicious parcel and demonstrated a positive alert for odor of narcotics coming from the parcel with the tracking number 1Z58FV760100110404. *Id.* Officer Irvin's K9 partner also sniffed several other packages and showed no change in behavior. *Id.* Following the K9's positive alert, law enforcement seized the package from UPS and proceeded to apply for this search warrant to search the suspicious parcel. *Id.* at Application Page at 2-3. After the search warrant was signed by a Hennepin County judge,

5

law enforcement executed the warrant and recovered methamphetamine from the parcel. *Id.* at Search Warrant Page 1-2 and Receipt, Inventory and Return.

Defendant argues that the application for the first search warrant does not establish probable cause to believe that the item sought was being used to commit a crime or was tending to show that a crime had been committed. *See* ECF No. 35 at 2. But the warrant application for the UPS parcel sets forth sufficient facts to lead a prudent person to believe that there was a fair probability that controlled substances or evidence of a crime would be found in the package. *See Hudspeth*, 525 F.3d at 674. For example, Officer Irvin noted for the issuing judge how illicit drugs are frequently sent from California. Officer Irvin also noted for the issuing judge the other suspicious details of the package including the fact that the sender/receiver names were not tied to the actual addresses listed on the package. The K9 sniff performed on the package also indicated that the package contained illicit narcotics. Based on these circumstances as set forth in the application, the issuing judge could conclude that there was a fair probability that illicit narcotics or evidence of narcotics would be found in the package. *See Gates*, 462 U.S. at 238. Therefore, the Court finds that probable cause existed for the issuing judge to issue the search warrant for the parcel.

Because probable cause supported the first search warrant, there is no basis to suppress the second warrant as fruit of the poisonous tree. Although Defendant represented at the hearing that the review of the first search warrant will influence the review of the second search warrant, Defendant's motion at times reads as a four corners challenge to both warrants. Therefore, in the alternative, the Court will review the four corners of the second warrant for the residence at Glenwood Avenue.

**2. Search Warrant for Glenwood Avenue**

Officer Googins—a licensed peace officer in the State of Minnesota—applied for the second search warrant for several things and property—including but not limited to documents, mobile phones, controlled substances, proceeds from illegal narcotics dealings, and firearms—believed to be located at the residence on Glenwood Avenue in Minneapolis, Minnesota and used as a means of committing a crime and or constitutes a crime. *See* Gov't's Ex. 2 at Application Page 1-2.

Officer Googins has been a licensed peace officer since 2013. *Id.* at Application Page 2. Officer Googins is assigned to the Violent Offender Task Force with the Hennepin County Sheriff's Office where he investigates various crimes related to gang activity, narcotics distribution, and weapon offenses. *Id.* Officer Googins also has five years of experience as a federal Task Force Officer with the Drug Enforcement Administration. *Id.*

The application in support of the search warrant for Glenwood Avenue provides that Officer Googins was contacted on September 19, 2023 by Officer Irvin (the affiant of the parcel search warrant) who provided Officer Googins with the following information. *Id.* On September 19, 2023, Officer Irvin located a suspicious looking parcel with the tracking number 1Z58FV760100110404 at the Minneapolis Airport UPS Sorting Facility. *Id.* Officer Irvin's K9 partner sniffed the suspicious parcel and gave a positive alert for an odor of narcotics coming from the parcel. *Id.* at Application Page 3. The K9 also sniffed 40 to 50 other items prior to sniffing the suspicious parcel and the K9 exhibited no change in behavior prior to sniffing the parcel at issue. *Id.* Further, after the positive alert from the K9, the parcel was seized from UPS and brought to the Airport Police Narcotics Office

pending the outcome of Officer Irvin's application for a search warrant. *Id.* After Officer Irvin received authorization to search the parcel, he executed the warrant on the parcel, finding multiple zip lock bags containing a significant amount of a substance consistent with methamphetamine. *Id.* Law enforcement proceeded to cut open the zip lock bags and conducted a field test on the substance, resulting in a positive match for methamphetamine. *Id.*

The application includes photographs of the methamphetamine in the zip lock bags as well as the parcel's label. *Id.* at Application Page 3-4. Officer Googins provides that he had learned that on September 19, 2023 UPS had marked the parcel as "undeliverable" because no unit number was included with the Glenwood Avenue address which is a six-unit condominium building. *Id.* at Application Page 4. On this same day, Officer Googins had learned that the address had been updated with unit number two. *Id.* After receipt of the unit number, Officer Googins provided in his application that he had enacted a plan to have undercover detectives conduct a controlled delivery of the suspect parcel to the Glenwood Avenue residence. *Id.* Officer Googins further provided that the recipient on the label of the suspect parcel had not been verified as a real person nor was there any indication the recipient on the label had any association with the residence at Glenwood Avenue. *Id.* at Application Page 5. Officer Googins also provided his extensive experience with investigating similar matters involving narcotics, including his experience in uncovering drug dealers' tendency to use fictitious addresses or names to evade detection by law enforcement, drug dealers' tendency to use firearms to protect themselves or their product, drug dealers' tendency to conceal their narcotics and proceeds in areas associated

with their property, as well as drug dealers' tendency to use vehicles to distribute, store, or transport narcotics. *Id.* at Application Page 5-6. Therefore, Officer Googins requested a search warrant for, among other things, the residence at Glenwood Avenue. *Id.* at Application Page 4-5. After the search warrant was signed by a Hennepin County judge, law enforcement executed the warrant. *Id.* at Search Warrant Page 1-3 and Receipt, Inventory and Return.

Defendant argues that the application in support of the search warrant of the residence at Glenwood Avenue does not establish probable cause to believe that the items described in the search warrant would be found on Defendant or in the premises searched. *See* ECF No. 35 at 2. Defendant further argues that the application does not show probable cause to believe that the items sought were used as a means of committing a crime, were evidence to show a crime had been committed, or that Defendant committed a crime. *Id.*

The warrant application for the residence at Glenwood Avenue sets forth sufficient facts to lead a prudent person to believe that there was a fair probability that controlled substances or evidence of a crime would be found at the residence. *See Hudspeth*, 525 F.3d at 674. For example, Officer Googins set forth sufficient facts relating to the suspicious package which was addressed to the residence at Glenwood Avenue and the methamphetamine found in the suspicious parcel. Officer Googins also outlined his extensive experience with the tactics drug dealers tend to use to avoid detection by law enforcement (i.e., using a fake recipient name on a packaging label containing elicit drugs). Based on these circumstances as set forth in the application, the issuing judge could conclude that there was a fair probability that illicit narcotics or evidence of other illegal

activity in the form of documents, communications, receipts, etc. relating to the distribution or possession of illicit narcotics would be found at the residence the package containing methamphetamine was addressed to, regardless of Defendant. *See Gates*, 462 U.S. at 238. The Court finds that probable cause existed for the issuing judge to issue the second search warrant at issue.

### 3. *Leon* Good-faith Exception

Even if the applications failed to establish probable cause, the *Leon* good-faith exception applies. The Supreme Court in *United States v. Leon* held that the exclusionary rule does not apply when law enforcement obtained evidence by acting on "objectively reasonable reliance on a subsequently invalidated search warrant." 468 U.S. 897, 922 (1984). "The purpose of the exclusionary rule is to deter police misconduct, and where the police have relied, not on their own assessment of the evidence, but on the probable cause determination of a neutral and disinterested judge, there is no police misconduct, and thus, nothing to deter through application of the exclusionary rule." *United States v. Bennett*, No. 23-cr-108 (PJS/JFD), 2023 WL 9058403, at *6 (D. Minn. Nov. 7, 2023) (citing *Herring v. United States*, 555 U.S. 135, 142 (2009); *Leon*, 468 U.S. at 916), *report and recommendation adopted*, 2024 WL 22103 (D. Minn. Jan. 2, 2024). Nevertheless, the good-faith exception does not apply if any of the following circumstances are present:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially

> deficient that no police officer could reasonably presume the
> warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702-03 (8th Cir. 2017) (quotations omitted)

(quoting *Leon*, 468 U.S. at 923).

Contrary to Defendant's assertions, *see* ECF No. 35 at 2, none of the above circumstances are present in this case. There is no indication that the issuing judges abandoned their judicial role. And consistent with the Court's above findings of probable cause, the Court finds Officer Irvin's application and Officer Googins's application not so lacking in probable cause as to render their belief in its existence entirely unreasonable. Finally, the applications were not so facially lacking in probable cause as to preclude reasonable reliance on the search warrants at issue.

In sum, the Court finds that probable cause existed to support both search warrants and, even if probable cause did not exist, the *Leon* good-faith exception applies. Therefore, the Court recommends that Defendant's motion to suppress search and seizure evidence be denied.

## B. Motion to Suppress Statements

Defendant next moves to suppress his statements, admissions, and answers he made to law enforcement after his arrest on September 20, 2023. *See* ECF No. 38. Defendant argues that his statements should be suppressed because they were not given freely and voluntarily in light of Defendant allegedly being impaired at the time and his statements were made without the assistance or benefit of counsel. *Id.* at 1. In response, the Government contends that Defendant's statements were made voluntarily and the

recording of the September 20, 2023 interview of Defendant, *see* Gov't's Ex. 3, and testimony from Special Agent Michael Cohen of the Drug Enforcement Administration will establish such a finding. *See* Gov't's Resp. at 5-6. Because the Court finds that Defendant made a voluntary, knowing, and intelligent waiver of his *Miranda* rights, the Court recommends that Defendant's motion to suppress his statements be denied.

The Fifth Amendment requires that law enforcement inform a person of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) before beginning a custodial interrogation. *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007). A defendant may waive his *Miranda* rights, provided that the defendant does so voluntarily, knowingly, and intelligently. *United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007). The burden is on the Government to show the waiver was valid by a preponderance of the evidence. *United States v. Black Bear*, 422 F.3d 658, 663 (8th Cir. 2005). The Government "does not need to show that a waiver of *Miranda* rights was express. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). An implicit waiver of the right to remain silent "is sufficient to admit a suspect's statement into evidence." *Id.*; *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights."); *United States v. Soto*, No. 07-cr-223 (PJS/JSM), 2007 WL 3120816, at *13 (D. Minn. Oct. 23, 2007) ("[A] defendant's willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver."). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, the accused's uncoerced

statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384.

## 1. Voluntariness

A *Miranda* waiver is made voluntarily only if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also New*, 491 F.3d at 374 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). "A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (quotation omitted); *accord Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary.'"); *New*, 491 F.3d at 374 ("Our cases hold that a confession may not be found involuntary absent some type of coercive activity on the part of law enforcement officials.") (quotation omitted). "In order to determine whether a confession was voluntary, [courts] look to the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (quotation omitted). Courts look to whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Sanchez*, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotations and citations omitted).

As background, Special Agent Cohen testified that following the controlled delivery of the parcel and the subsequent detention of Defendant, Defendant was transported by the Violent Offender Task Force to the Hennepin County Sheriff's Office where he was placed

in an interview room at approximately 4:04 p.m. on September 20, 2023. Tr. 13:15-18:10. Special Agent Cohen further stated that the agents that were set to conduct the interview of Defendant—including Special Agent Cohen—arrived at approximately 4:45 p.m. on September 20, 2023. Tr. 21:23-25.

This Court's independent review of the recording of the September 20, 2023 pre and post-*Miranda* interview of Defendant[1], *see* Gov't's Ex. 3, "clearly and readily indicates that [law enforcement] did not engage in threatening or coercive tactics." *See United States v. Evans*, No. 19-cr-294(2) (PJS/LIB), 2020 WL 1930586, at *5 (D. Minn. Mar. 4, 2020), *report and recommendation adopted*, 2020 WL 1923225 (D. Minn. Apr. 21, 2020). The officers and agents at the interview were professional and respectful during the interview and made no threats or promises. *See Evans*, 2020 WL 1930586, at *5. Review of the recording shows that the interview was conducted in a conversational tone. *See United States v. Beaulieu*, No. 20-cr-235 (ECT/LIB), 2021 WL 3813317, at *5 (D. Minn. July 21, 2021) (concluding that the totality of the circumstances did not indicate that the defendant's will was overborne where the interview was conducted in a conversational tone and the interviewers made no threats or promises to the defendant), *report and recommendation adopted*, 2021 WL 3809927 (D. Minn. Aug. 26, 2021); *see also United States v. Mims*, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding *Miranda* waiver voluntary where, among other factors, interview was conducted in a reasonable and conversational tone). Defendant spoke willingly and non-defensively with law enforcement throughout. *See Evans*, 2020

---

[1] At the hearing, the Government represented that it does not intend to introduce any statements made by Defendant prior to his waiver of the *Miranda* warnings. *See* Tr. 25:3-7.

14

WL 1930586, at *5. Defendant spoke clearly and responded coherently to the questions law enforcement asked. *See Beaulieu*, 2021 WL 3813317, at *5. Further, the interview lasted for approximately two hours and twenty minutes including a breaktime and was therefore not coercive in its duration. Tr. 25:9-11, 26:23-27:8. *See, e.g., United States v. Makes Room*, 49 F.3d 10, 415 (finding interrogation lasting over two hours not coercive in duration); *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir. 1988) (finding seven-and-a-half-hour-long interrogation not coercive in duration). In sum, there is nothing in the record that demonstrates that Defendant was coerced into making his statements to law enforcement. *See Vinton*, 631 F.3d at 482 ("There is no credible evidence that the police coerced [Defendant] into making the statements, or that his decision to speak with them was the product of anything other than a free and unconstrained choice.").

Nor does the fact that Defendant vomited prior to the start of his interview demonstrate that his will was overborne or that his statements were not made voluntarily. *See* Gov't's Ex. 3 at 0:23:59-0:44:33. "[T]he assertion of experiencing pain alone does not demonstrate that a Defendant's will is overborn." *United States v. Barrett*, No. 19-cr-157(1) (WMW/LIB), 2019 WL 7580109, at *8 n.7 (D. Minn. Sept. 16, 2019) (citation omitted), *report and recommendation adopted*, 2019 WL 6168194 (D. Minn. Nov. 20, 2019). Moreover, Defendant claims he was impaired and points to the fact that he vomited as evidence that he was impaired during his interview. *See* ECF No. 38. While "'[s]leeplessness, alcohol use and drug use are relevant' to the validity of a *Miranda* waiver, [ ] '[i]ntoxication and fatigue do not automatically render a confession involuntary.'" *United States v. Huntington*, No. 20-cr-145 (ECT/BRT), 2021 WL 165112,

at *4 (D. Minn. Jan. 19, 2021) (quoting *Gaddy*, 532 F.3d at 788 (8th Cir. 2008)). "The correct test is whether a defendant's mental impairments caused his will to be 'overborne.'" *Id.*

The evidence in this case demonstrates that Defendant's claimed impairment did not cause his will to be overborne. It is important to note that Defendant never once claimed to be under the influence of drugs or alcohol before or during his interview with law enforcement. *See* Gov't's Ex. 3. Over ten minutes prior to law enforcement reading Defendant's *Miranda* rights to him—more than once—and Defendant's subsequent waiver, Defendant asked an officer for a trash can. *Id.* at 0:24:19. An officer responded by asking Defendant whether he was going to be sick to which Defendant replied: "I think so." *Id.* at 0:24:19-0:24:51. The recording shows Defendant vomit for a short time prior to the start of his interview with law enforcement. *Id.* at 0:24:51-0:44:33.

Special Agent Cohen testified as to Defendant's time in the interview room prior to the start of his interview. Special Agent Cohen—who was one of the agents that participated in the interview of Defendant—testified that he had learned from the officers that were in the room with Defendant when he vomited that Defendant "had become nervous, upset[2], and threw up in a trash can." Tr. 20:8-15. Special Agent Cohen understood that Defendant had asked for a trash can before throwing up. Tr. 20:16-18. Special Agent Cohen was also aware that Defendant had been provided drinking water. Tr. 20:13-19.

---

[2] Special Agent Cohen clarified at the hearing what he meant by "upset." Special Agent Cohen testified that Defendant appeared upset, meaning he had been "told bad news." *See* Tr. 35:5-8.

After an independent review of the recording, the Court finds Special Agent Cohen's testimony to be consistent with the recording.

Furthermore, Special Agent Cohen testified that after learning of Defendant's vomiting, he made the conclusion that Defendant must have felt "the gravity of the situation . . . and he became upset and nervous and threw up in a trash can." Tr. 20:23-21:3. Special Agent Cohen further stated that in his experience and training it is not uncommon for suspects to become sick because of feelings of nervousness, anxiety, or stress. Tr. 21:9-15, 33:1-19. Special Agent Cohen represented that Defendant was not questioned in any meaningful way prior to the start of the interview. Tr. 19:9-12. Special Agent Cohen understood that Defendant had engaged in small talk with the officers that sat with him prior to Special Agent Cohen's and others arrival. Tr. 19:9-21. This testimony is also consistent with the recording of the interview.

Special Agent Cohen also testified that he observed the trash can by Defendant but only observed him spit in the trash can a few times. Tr. 21:16-22. According to Special Agent Cohen, Defendant did not appear to be sick during the interview, Tr. 27:25-28:2, and did not consider Defendant's prior vomiting as exacerbating the issue of voluntariness. Tr. 24:21-25:1. In fact, Special Agent Cohen believed Defendant's prior vomiting to have "calmed him down." Tr. 24:21-25:1. Special Agent Cohen testified that he asked Defendant at the start of his interview whether he was feeling okay. Tr. 22:2-7. This too is consistent with the recording of the interview. After being asked how he was feeling at the start of the interview, Defendant responded "fine." Gov't Ex. 3. at 0:44:18-0:44:25. At the very end of Defendant's interview, officers checked in with Defendant again on how he was feeling

17

and took note of the fact that Defendant appeared to be feeling better. *Id.* at 2:54:07-2:54:21. One officer also asked Defendant whether his pre-*Miranda* interview vomiting was the cause of feelings of nervousness or whether there was some other reason. *Id.* Rather than claiming to be under the influence, Defendant responded: "I just hate doing this." *Id.*

As Special Agent Cohen testified credibly, Defendant did not appear to be under the influence of any substance. *See* Tr. 23:22-25. Rather, Special Agent Cohen found Defendant to be "very cordial, very receptive, asked a lot of questions." Tr. 24:1-3. Special Agent Cohen further stated that Defendant was lucid, appeared to be following the questions he was asked, and provided coherent responses to the questions asked. Tr. 24:4-11. Based on the Court's independent review of the recording, Special Agent Cohen's testimony is consistent with the recording which shows Defendant—post-*Miranda*—to be coherent and responsive. *See* Gov't's Ex. 3 at 0:41:21-2:57:08. And the fact that Special Agent Cohen or other officers did not ask Defendant whether he was under the influence does not change the analysis. *See United States v. El-X*, No. 11-cr-109 (PJS/JJG), 2011 WL 3155691, at *4 (D. Minn. July 6, 2011) (finding that the defendant's statements were made voluntarily where "[a]lthough [the officer] knew that Defendant was taking medication, he did not know what it was or the dosage"), *report and recommendation adopted*, 2011 WL 3154859 (D. Minn. July 26, 2011).

Under all the circumstances, the Court concludes that, despite his alleged impairment, Defendant's will was not overborne. His statements to law enforcement were the product of a free and deliberate choice, and not the product of intimidation, coercion, or deception. Accordingly, the Court concludes that Defendant's waiver of his *Miranda*

rights and subsequent statements to law enforcement on September 20, 2023 were voluntary. *See, e.g., United States v. Warbritton*, 360 Fed. App'x 698, 699 (8th Cir. 2010) (per curium) (affirming the denial of a suppression motion where "there was no evidence to suggest that law enforcement officers used coercive tactics while questioning [the defendant] after his vehicle accident, or that [the defendant's] will was overborne, despite his intoxication and injuries"); *Gaddy*, 532 F.3d at 786, 788 (claims of intoxication and lack of sleep did not outweigh testimony that the defendant was "awake and coherent" for *Miranda* waiver); *United States v. Wright*, No. 15-cr-89 (JNE/FLN), 2015 WL 4136083, at *4 (D. Minn. July 8, 2015) (finding that statements made by a defendant who had been shot multiple times three days earlier were voluntary where "at the time of the interview he showed no signs of severe pain or distress" and the interviewing officer testified that the defendant "seemed coherent and lucid throughout the interview").

### 2.  Knowing and Intelligent

The Court must also consider whether Defendant's *Miranda* waiver was knowing and intelligent. The Court finds that Defendant's *Miranda* waiver was knowing and intelligent. It is not enough that the Government "establishes that a *Miranda* warning was given and the accused made an uncoerced statement . . . . The [Government] must make the additional showing that the accused understood these rights." *Berghuis*, 560 U.S. at 384. "To make a knowing and intelligent waiver, the defendant must have 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Gallardo*, 495 F.3d at 990 (quoting *Moran*, 475 U.S. at 421). Whether a waiver is knowing and intelligent is based on the totality of the circumstances. *Id*. at 990-

91. "Courts often consider whether the suspect was clearly under the influence of a substance or medication that might affect his ability to understand his rights; the timing of the interview as compared to ingestion of such substances; whether the suspect's speech was coherent; and if he seemed to understand the questions posed to him." *United States v. Booker*, No. 13-cr-3 (JRT/FLN), 2013 WL 12074955, at *2 (D. Minn. Mar. 8, 2013) (citations omitted), *report and recommendation adopted*, 2013 WL 12074956 (D. Minn. Mar. 27, 2013).

It is not clear exactly what, if any, substance Defendant consumed on the date of the interrogation, or how long before the interrogation Defendant allegedly consumed some substance. Notwithstanding the fact that Defendant may have consumed some type of substance, nothing in the record demonstrates that Defendant "was clearly under the influence of a substance or medication that might affect his ability to understand his rights." *Id*. Defendant appeared to comprehend the conversation entirely, understood the questions being asked of him, and provided his answers. Although Defendant spoke in a quiet tone of voice at times, Defendant spoke clearly and coherently during the interrogation, he did not slur his words, and he did not appear confused, groggy, or unable to understand his rights.

The Court credits Special Agent Cohen's testimony that Defendant did not appear to be under the influence of any substance. *See* Tr. 23:22-25. The Court conducted an independent review of the recording of the interrogation and agrees with Special Agent Cohen that Defendant did not appear in any way to be under the influence of any substance because Defendant was "very cordial, very receptive, asked a lot of questions"; was lucid,

coherent, and appeared to be tracking the questions asked. *See* Tr. 23:22-24:11. The Court also agrees with Special Agent Cohen that Defendant understood his *Miranda* rights and "was very calm, cool, and collected about it." *See* Tr. 22:18-23:5. In light of Defendant's statements, answers, and demeanor during the interrogation, there was no reason to not believe that Defendant understood his *Miranda* rights when he confirmed he understood his rights more than once. Tr. 22:14-24:20; *see* Gov't's Ex. 3 at 0:41:21-0:43:01. Defendant never showed implicitly or explicitly a desire to stop the interview or to speak with an attorney. *See* Gov't's Ex. 3 at 0:41:21-2:57:08. Although Defendant did vomit prior to his *Miranda*-interview the record shows that he understood what was occurring and the rights he was giving up by openly speaking with law enforcement. Defendant was fully aware of both the nature of the rights being abandoned and the consequences of the decision to abandon his rights. *See Gallardo*, 495 F.3d at 990; *Moran*, 475 U.S. at 421. Therefore, under the totality of the circumstances, the Court concludes that Defendant's waiver of his *Miranda* rights was knowing and intelligent.

In sum, the Court concludes that Defendant waived his *Miranda* rights by responding to law enforcements questions after being informed of his rights, and the waiver was voluntary, knowing, and intelligent. Accordingly, the Court recommends that Defendant's motion to suppress his statements to law enforcement at the Hennepin County Sheriff's Office on September 20, 2023 be denied.

### III. RECOMMENDATION

Based upon the foregoing, and all files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Search and Seizure Evidence, ECF No. 35, be **DENIED**.

2. Defendant's Motion to Suppress Statements, ECF No. 38, be **DENIED**.


Date: June 28, 2024                                    *s/ Tony N. Leung*
                                                       Tony N. Leung
                                                       United States Magistrate Judge
                                                       District of Minnesota

                                                       *United States v. Valle*
                                                       Case No. 23-cr-350 (MJD/TNL)

## <u>NOTICE</u>

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.